(No. 26459.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WARNER BOOKER *et al.* Plaintiffs in Error.

*Opinion filed November 24, 1941.*

HENRY E. PRATT, and JOHN E. DOUGHERTY, (JOHN H. WELCH, of counsel,) for plaintiffs in error.

GEORGE F. BARRETT, Attorney General, and LESTER F. CARSON, State's Attorney, (ROY P. HULL and JESSE D. WEAST, of counsel,) for the People.

Mr. JUSTICE SMITH delivered the opinion of the court:

Plaintiffs in error, Warner Booker and Alvin Jones, upon a trial by a jury in the circuit court of Peoria county, were found guilty of the murder of Doyle Ping. Booker was sentenced to life imprisonment and Jones for a term of thirty years. By this writ of error they seek to reverse that judgment.

Doyle Ping was a truck driver residing in Sperry, Iowa. He was thirty-four years of age at the time of his death. He was about six feet tall and weighed between one hundred eighty and two hundred pounds. On February 16, 1941, Ping, accompanied by Charles Wagner, also of Sperry, drove a truck load of stock from Sperry to the stockyards in Peoria. The stock was unloaded about 9:30 P.M. and Ping and Wagner then separated. Ping registered at the Stock Yards Hotel and went to bed; he got up again about midnight, and at 12:30 drove away in his truck. From that time, until the fight in which he lost his life occurred, his movements are not shown. There is no evidence in the record tending to show that Ping had been drinking on the night in question.

Warner Booker, one of the defendants, was employed at the Jefferson Hotel in Peoria, as a waiter. He was

twenty years of age. On the evening of February 16, 1941, he left the hotel about 8:30. Before he left he had several drinks of liquor, which were given to him by one of the bellboys. He went from there to Felix's Place on Hamilton street, where he there met Alvin Jones. Jones was twenty-one years of age; he worked part time at washing cars and was partly on relief, and he had not been working for two or three weeks. Booker and Jones then drank some wine which Jones procured at the Marble Palace, next door. Shortly thereafter Jones' wife, Berleatha, joined them. They were also joined by one Kathryn, a girl friend of Booker. The four of them drank, danced and visited most of the evening. During the evening Jones asked to see a gun that Booker carried. They went into the alley where Booker fired the gun twice at a telephone pole. About 12:30 A.M. they decided to go to a place referred to in the record as the Granada, on North Washington street. Booker and Jones and Jones' wife then started in that direction. When the trio reached a point in the 200-block on North Washington street, Mrs. Jones left her companions and went around to the side of the building. Shortly Booker and Jones heard her swearing at Doyle Ping. Jones went back to investigate. He was followed shortly by Booker. A fight ensued between Ping on the one side, and Booker and Jones on the other. The only evidence in the record as to who started the fight is the testimony of Mrs. Jones. She claimed that Ping struck her husband first. In the statement made by Jones to the State's attorney, shortly after the killing, he gave his version of how the fight started, as follows: "Then Booker asked what the trouble was and I said 'He is getting smart with the girl,' and we started fighting." Neither of the defendants testified on the trial. Loren Tary, a cab driver, was passing near the scene of the fight. He testified that he saw a fight there and could not at first see who it was; that it was a couple of "colored fellows and a white

fellow." He further testified: "There was a colored lady standing on the sidewalk and just as I got up with them the white fellow got up off the ground; they had him down on the driveway there. He got up off the ground where he had been and he broke loose; they tried to get him down again; he broke loose and ran across the street." The fight continued on across the street and up on the porch of a house at 221 North Washington street. Ping knocked Booker off the porch and Booker then shot him. A *post-mortem* examination disclosed that the bullet entered the left side of Ping's body from the rear. It grazed the backbone, was deflected, and went through the right lung and lodged in the seventh rib, on the right side, in front. The shot mortally wounded Ping. His two assailants, with Jones' wife, immediately fled to the Granada, a short distance away. On the way to the Granada, Booker disposed of the gun by throwing it on the roof of a building. In Booker's statement to the State's attorney he admitted he fired the shot when Ping was at the top of the porch steps and that Booker was down on the ground or sidewalk below. The gun was later recovered by the police under Booker's direction. When found, it contained three empty and two loaded shells. Booker was shortly thereafter arrested by the police at the Granada, and Jones and his wife were arrested a short time later. They both signed sworn statements given by them when questioned by the State's attorney. These statements were admitted in evidence on the trial.

On behalf of the People, Opal Hill and Edna Murphy, residents of 221 North Washington street, testified that they heard a scuffle across the street in front of the house in which they lived. Edna Murphy testified that she went to the back of the house and called the police; that she heard a noise on the front porch and voices saying, "Kill that ———." Opal Hill testified that she looked out the front window and saw Ping run up on the porch pursued

by Booker and Jones; that she heard the same language as testified to by Edna Murphy; that Ping beat on the door trying to get in, and that Booker was carrying a gun in his hand as he followed Ping up on the porch. Neal Johnson, a police officer, testified that in response to a call at 12:52 A.M. he took a squad car and went to the 200 block on North Washington street; that he arrived in time to see Booker knocked off the porch; that Booker then ran back on the porch and after Jones had kicked Ping, who was lying on the porch, they ran up the street together. Ping died shortly after he arrived on the scene. Johnson testified that the white man was trying to get out of their way. All the other witnesses for the People merely testified to the cause of death and the identity of the body.

In behalf of the defendants, Berleatha Jones testified that Ping accosted her and she told him to go away; that her husband came back to where she was talking to Ping. After telling Ping he was her husband, Booker shortly came on the scene; that Ping struck Jones first; that Ping was getting the best of the two colored men at the time the shooting occurred; that he had knocked both Booker and Jones down before the shot was fired. She testified that the fight continued without interruption after it was started; that Jones preceded Ping up onto the porch of 221 North Washington street. The only other testimony introduced by the defense was evidence as to the general reputation of Booker as a peaceful and law-abiding citizen. Neither of the defendants testified on the trial. In the statement made by Jones to the State's attorney, which was introduced in evidence, he stated that when he attempted to remonstrate with Ping the latter pushed him and told him it was none of his business. Booker, in his statement, said the fight had started by the time he got back to where Jones was talking to Ping. This is all the evidence in the record as to how the fight started. When arrested, Jones was carrying an open knife in his pocket.

He stated that he carried this knife open on Saturday evenings because "people were apt to push him around."

The principal ground urged for a reversal of the judgment of conviction is that the guilt of the defendants was not established beyond a reasonable doubt. They also object to certain instructions given on behalf of the People.

As to the first error assigned, we have examined the evidence in the record carefully and in detail. In so far as it is material, we have set it out in this opinion. In a criminal case it is the peculiar province of the jury to weigh the evidence and determine the facts. This court will not reverse a judgment of conviction on the ground that the evidence is insufficient to sustain the finding of guilt, unless there is clearly a reasonable and well-founded doubt of the guilt of the accused and the verdict is found to be palpably contrary to the weight of the evidence. *People* v. *Angelica*, 358 Ill. 621; *People* v. *Kidd*, 357 id. 133; *People* v. *Miller*, 342 id. 244; *People* v. *Herbert*, 340 id. 320; *People* v. *Buskievich*, 330 id. 532; *People* v. *Hicketts*, 324 id. 170.

Plaintiffs in error object to instructions Nos. 2, 4, 7, 12, 13, 14, 15 and 16, given on behalf of the People. Instructions Nos. 2, 4 and 7 are objected to because it is said they ignored the element of self-defense. Each of these instructions defined the terms "malice" and "malice aforethought." There is no reference in either to the element of self-defense. The objection to instruction No. 12 is that it told the jury that, as a matter of law, the defendants could not avail themselves of the claim of self-defense if the jury believed that the necessity of self-defense was brought on by their own deliberate and wrongful act. It is said that this instruction wrongfully inferred that the defendants struck the first blow. Instruction No. 13 is objected to because it is an abstract statement in substantially the language of section 149 of the Criminal Code. (Ill. Rev. Stat. 1941, chap. 38, par. 367.) The objection to instruction No. 14 is that it told the jury that the law

of self-defense does not imply the right of attack in the first instance, and if the jury believed that the defendants sought or brought on a difficulty with the deceased they could not be acquitted on the ground of self-defense. Instruction No. 15 is objected to because it is claimed that this instruction permitted the jury to ignore the evidence offered by the defendant Booker as to his previous good reputation, as a peaceable and law-abiding citizen. The objection to instruction No. 16 is that it told the jury that if it believed from the evidence the defendants fled and remained away from the scene of the crime, immediately after its commission, the jury might consider such flight as a circumstance in determining their guilt or innocence.

As to instructions Nos. 2, 4 and 7, while an instruction in similar language was disapproved in the case of *People* v. *Clark,* 368 Ill. 183, that case is easily distinguishable from this case. In that case there was ample evidence upon which to base the defense of self-defense. No such situation exists in this case. Here there was no evidence worthy of consideration which tended to show that the defendants acted in self-defense. While it may be true that the deceased struck the first blow at the inception of the altercation with Jones, as testified to by Jones' wife, this showing relates only to the original controversy between the deceased and Jones. It is shown by the evidence, beyond any controversy, that immediately thereafter both of the defendants viciously assaulted the deceased far beyond any claimed necessity for their own defense; that they fought him all the way across the street when everything in the record indicates that he was trying to get away from them. They followed him up on the porch where he was trying to take refuge and attempting to break in the door to escape from them. Both of the defendants were armed with dangerous weapons—Jones with an open knife in his pocket and Booker with a gun in his hand. They had both been drinking. As we view the evidence in the record, there

is no element of self-defense whatever in this case. Obviously, the claim of self-defense was purely an afterthought. In this state of the record it was not error to give these instructions. This case is quite different from the case of *People* v. *Clark, supra.* As above stated, in that case there were ample grounds upon which the defendant could reasonably contend that he acted in self-defense. Regardless of who may have actually struck the first blow, all the evidence shows that after the fight started the defendants were at all times the aggressors; that they followed the deceased and continued to fight him until he was felled by the fatal shot from the gun in the hands of Booker. Still not being satisfied, Jones kicked him twice as he lay prostrate on the porch floor with life almost, if not quite, extinct. They killed him when they had no reasonable cause to apprehend danger.

As to instruction No. 12, it was particularly applicable to the facts in this case. It told the jury, in substance, that a defendant charged with murder cannot avail himself of a claim of self-defense if the jury believed from the evidence beyond a reasonable doubt that the necessity for self-defense was brought on by the defendants' deliberate and wrongful act. The instruction condemned by this court in *People* v. *Bradley,* 324 Ill. 294, upon which plaintiffs in error rely, was entirely different. The instruction criticized in that case was as follows: "The court instructs the jury, that the defendant, charged with murder in this case, cannot avail himself of the plea of necessary self-defense, if the necessity for the killing, if there was a person killed by him, was brought on by the defendant's own deliberate and wrongful act." In discussing that instruction this court said: "It does not tell the jury that if the evidence showed beyond a reasonable doubt, or even if it was shown by the evidence, that defendant brought on the necessity for the killing he could not avail himself of the plea of self-defense. It was a mere statement of an ab-

stract proposition without reference to what the evidence showed and was prejudicial to defendant." The first part of the instruction complained of in this case was written in language similar to the instruction condemned in the *Bradley case,* but there was added the following language, not contained in the instruction in that case, viz: "If you believe from the evidence beyond a reasonable doubt the necessity for self-defense was brought on by their own deliberate and wrongful act." The above quoted language was not in the instruction before the court in the *Bradley case.* The addition of these words met and obviated the grounds upon which the instruction was condemned in that case.

Instruction No. 14 was on the subject of self-defense. It stated that self-defense does not imply the right of attack in the first instance and that if the jury believed from the evidence, beyond a reasonable doubt, that the defendants sought or brought on a difficulty with the deceased, or at the time of the shooting had no reasonable cause to apprehend immediate or impending injuries to themselves or others, they could not avail themselves of the law of self-defense. It is argued that this instruction was also condemned in *People* v. *Clark, supra.* In that case this court said that the first part of the instruction should not have been given for the reason that it was not good practice to include in instructions propositions of law not applicable because such practice might result in misleading the jury. The same may be said in this case. There is no direct evidence that the defendants made the first attack. It was erroneous to give an instruction stating that the law of self-defense did not imply the right of attack in the first instance, because of the absence of evidence that the defendants did make the attack in the first instance. However, under the facts shown by the record in this case, we do not think this instruction misled the jury or resulted in

prejudice to the defendants. The instruction further advised the jury that if the jury believed from the evidence beyond a reasonable doubt that the defendants sought or brought on a difficulty with the deceased and killed him at a time when they had no reasonable cause to apprehend the approach of immediate or impending injuries to themselves, or others, from a spirit of utter disregard of human life, then the defendants could not avail themselves of the law of self-defense. While the first part of this instruction should have been omitted, when the whole instruction is considered, we do not think that it prejudiced the defendants or constituted reversible error on the record in this case.

Instruction No. 15, it is claimed, in effect, directed the jury to disregard and ignore the evidence offered as to the defendant Booker's previous good reputation as a peaceable and law-abiding citizen. He established such reputation by substantial and credible evidence. We do not think this instruction is subject to the criticism made against it. It expressly told the jury that evidence of the general reputation of the defendant Booker as a peaceable and law-abiding citizen was to be considered as a circumstance in the case, but if the jury was satisfied beyond a reasonable doubt of his guilt, then the jury should find him guilty, notwithstanding the jury believed he had theretofore sustained a good general reputation as a peaceable and law-abiding citizen. When this instruction is read in connection with instruction No. 25, given on behalf of the defendants, it is apparent that the jury was fully and fairly instructed as to the weight to be given to the evidence tending to show his previous good reputation, as a peaceable and law-abiding citizen. By that instruction, given on behalf of the defendants, the jury was told that it should acquit the defendant Booker if, after a careful examination of all the evidence in the case, including that

bearing upon his previous good reputation, the jury entertained any reasonable doubt of his guilt. It was not error to give instruction No. 15.

The objection to instruction No. 16 is that the court told the jury, by that instruction, that if it believed from the evidence beyond a reasonable doubt that the defendants, immediately after the commission of the crime, fled and remained away from the scene of the crime until they were taken into custody, that such flight was a proper circumstance to be considered, in determining the guilt or innocence of the defendants. Plaintiffs in error argue that there was no evidence on which to base this instruction. We do not agree with this contention. There is no dispute but that the defendants both did leave the scene of the crime immediately after its commission in company with defendant Jones' wife; that when they fled they went to the Granada, which evidently was a tavern. Mrs. Jones testified that the police picked them up at that place. In the statement made by Booker, following his arrest, when questioned by the State's attorney, he said that after the deceased had fallen with the mortal wound and Jones had kicked him twice, "Mrs. Jones grabbed us and told us to come on. Then the three of us ran north on Washington street." He further stated that he and Mrs. Jones stayed in the Granada and Jones "went on out the back door." Jones, in his statement, said: "We went on up the street and Booker threw the gun away." When asked if they walked or ran, he answered: "Walked a little ways and run a little ways." That he told Mrs. Jones and Booker he was going out; that he did go out the back way; that he later came back and his wife and Booker were not there. They had been arrested in the meantime. Jones was arrested shortly thereafter. The evidence does, therefore, definitely show that both of the defendants fled from the scene of the crime and remained away until they were taken into custody. There was positive evidence on which

this instruction was based in the statements made by the defendants, as well as in the testimony of policeman Johnson, and Mrs. Jones. There was ample evidence on which to base the instruction on the subject of flight from the scene of the crime.

The remaining instruction to which objections are made is instruction No. 13. It was, in substance, in the language of section 149 of the Criminal Code and defined the law of self-defense. It is argued by plaintiffs in error that this instruction has been repeatedly condemned by this court as an abstract statement of law which should not be given in a homicide case. In *People* v. *Garines,* 314 Ill. 413, and other cases cited, it is true this instruction was disapproved on the records in those cases. However, an instruction in substantially the exact language of this instruction was approved in the later case of *People* v. *McNeal,* 346 Ill. 329, in the following language: "Under the circumstances shown by the evidence this instruction, which has been approved in numerous decisions of this court, was properly given."

Under the circumstances of this case we think this instruction was properly given. It could not have misled the jury or prejudiced the defendants.

All the errors assigned and argued in this court have been carefully considered. There is no substantial error in the record. Plaintiffs in error were ably defended by competent counsel of experience. There was nothing in the case tending, even remotely, to prove that they killed Ping in self-defense, or that there was any provocation sufficient to excuse, or even mitigate, the offense. Upon the evidence in the record, the jury might well have been justified in inflicting even more severe penalties. Plaintiffs in error had a fair trial, free from prejudicial error. The object of a review is not to determine whether the record is free from error, but to ascertain whether a just conclusion has been reached, founded upon competent and sufficient evi-

dence after a trial in which no error, prejudicial to the defendants' rights, has occurred. *People* v. *Schueneman,* 320 Ill. 127.

The court did not err in overruling the motion for a new trial and entering judgment on the verdict.

The judgment of the circuit court of Peoria county is affirmed.

*Judgment affirmed.*